**In the Matter Of:**

*MELVIN NEAL, JR. V.*

*HINDS COUNTY, MISSISSIPPI, ET AL*

*3:18-CV-590-CWR-FKB*

---

*VICTOR MASON*

*October 02, 2020*

---




We Bridge the State and Cover the Nation!

www.alphareporting.com

800-556-8974

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MELVIN NEAL, JR. PLAINTIFF

V. CAUSE NO. 3:18-CV-590-CWR-FKB

HINDS COUNTY, MISSISSIPPI, SHERIFF VICTOR P. MASON, IN HIS OFFICIAL CAPACITY, LIEUTENANT ANTONY SIMON, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY, SERGEANT JAMIE CASTON, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY, AND SERGEANT JOHN SCOTT, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY DEFENDANTS

DEPOSITION OF VICTOR MASON

Taken at the instance of the Plaintiff on Friday, October 2, 2020, by videoconference via Zoom, all parties attending via Zoom, beginning at 1:48 p.m.

(Appearances noted herein)

REPORTED BY: Courtney R. Taylor, CCR, TLC
Alpha Reporting Corporation
236 Adams Avenue
Memphis, Tennessee 38103

APPEARANCES:

MICHAEL S. CARR, ESQ.
Carr Law Firm, PLLC
301 West Sunflower Road, Suite D
Cleveland, Mississippi 38732

COUNSEL FOR PLAINTIFF

KATELYN A. RILEY, ESQ.
Allen, Allen, Breeland & Allen
214 Justice Street
Brookhaven, Mississippi 39601

COUNSEL FOR DEFENDANTS

INDEX

Style and Appearances.................................. 1-2
Index................................................... 3
Examination by Mr. Carr................................. 4
Certificate of Deponent................................. 21
Certificate of Reporter................................. 22

THE REPORTER: As the court reporter, I need to confirm that all counsel present are willing to stipulate that I can administer the oath via videoconference.

MR. CARR: Agreed.

MS. RILEY: Agreed.

VICTOR MASON,

having first been duly sworn, was examined and testified as follows:

EXAMINATION BY MR. CARR:

Q. Please state your name for the record, sir.

A. Victor P. Mason.

Q. All right. And, Mr. Mason, my name is Attorney Mike Carr. I am an attorney for Melvin Neal, who has filed a lawsuit against Hinds County and yourself and some of -- in your capacity as sheriff and some individual officers. I don't have many questions for you today, sir.

But have you given a deposition before?

A. Yes, I have.

Q. I imagine as the sheriff.

How many depositions have you given? Do you think?

A. Hundreds.

Q. Okay.

A. I mean, in my capacity, what you expect, right?

Q. Well, some sheriffs take more depositions than others. I don't know.

A. Yeah.

Q. You know -- so you understand how depositions work. I don't know if you've done a Zoom deposition before, but it's the same format. I'm going to ask some questions, and then just wait until I get to the end of my question. And then you would, respond clearly, so the court reporter gets down all that we talk about today.

Is that fair?

A. That's fair.

Q. Very good.

Now, Mr. Mason, when was your term as sheriff for Coahoma -- for -- not Coahoma -- for Hinds County?

A. It started January of 2016 and ended this year, of January -- well, actually, the end of December of last year.

Q. December of '19?

A. Correct.

Q. So you avoided the pandemic as sheriff, right?

A. Yes, I did.

Q. Okay. And this incident happened on December 28th, 2017.

Have you had an opportunity to review any paper documents associated with this claim?

A. No, I haven't, but I do know that Internal Affairs was assigned to it. We had an investigator assigned to it.

Q. Okay. Have you read the complaint in this case or any of the incident reports?

A. No, I haven't.

Q. All right. Have you read the Internal Affairs report?

A. I can't recall that one, because we have so many.

Q. Sure.

So the Internal Affairs report for Mr. Neal's allegation, the December 28, 2017, report, you haven't looked at that, correct?

A. No. No, I haven't.

Q. Do you have any independent recollection of this incident, this alleged use of force by Melvin Neal against -- or -- sorry -- alleged use of force that Melvin Neal alleges your three officers used against him?

A. No.

Q. Okay. As sheriff, what is your ability or your power to make policy for the sheriff's department?

A. Well, I'm in charge of the whole organization. And I, along with others, have to draft policies, general orders, especial orders, and we just have to do it all together.

Q. Okay. And what tools do you use to determine how to draft, let's say, a Use of Force policy?

How did you do that when you formulated it between 2016 and the end of 2019?

MS. RILEY: Objection to the question.

But you can answer.

A. We just go on past experience and who we have working.

Q. (By Mr. Carr) Okay. Is it fair say you take a policy of your predecessor, review it, and then tweak it or revise it as you see fit --

A. Yes.

Q. -- I mean, consistent with your standards and training?

A. Yes.

Q. All right. And I'm sure you get some legal

advice in there somewhere, correct?

MS. RILEY: Objection to the question.

But you can answer.

A. It's reviewed.

Q. (By Mr. Carr) Okay. Now, right when you came into office, the -- which was a January of '16, right --

A. That's correct.

Q. -- all right -- just seven months earlier the Civil Rights Division of the U.S. Department of Justice had issued a letter -- a detailed letter regarding an investigation that they been conducting of the Hinds County Adult Detention Center for a period of time involving the administration of your predecessor.

Is that correct?

A. That's correct.

Q. Are you familiar with that letter?

A. I'm familiar with the investigation.

Q. Okay. The investigation. And I'm not going to ask you specifics about the letter, and I -- you probably don't even have it in front of you.

But tell me generally what you, as the sheriff, did to come into compliance with the requirements of the U.S. Department of Justice and

improve conditions at the Hinds County Adult Detention Center?

MS. RILEY: I'm going to object to this.

But you can answer.

A. We tried to go into compliance with what they wanted the best we could with the budget we had.

Q. (By Mr. Carr) Okay. Did you -- as the sheriff, as you sit here today, can you think of any findings they made that you objected to and you said that we weren't going to get into compliance with?

A. I --

MS. RILEY: Obj- --

A. -- I --

MS. RILEY: -- -ection.

But you --

A. -- I --

MS. RILEY: -- can answer.

A. -- I didn't object to any of their findings.

Q. (By Mr. Carr) Okay.

A. I had to do what they requested.

Q. Well, I understand you had to do it. I was asking if you objected to having to do it?

A. No.

MS. RILEY: Objection.

But you can answer.

Q. (By Mr. Carr) Okay. Because sometimes you get told you have to do something that you don't think, you know, you should have to do in certain situations. I was just wondering if that happened with the DOJ report.

But you were generally okay with --

Well, strike that.

You made efforts, through your sheriff's department, to come into compliance with the civil rights division requests -- or findings, correct?

A. Correct.

Q. All right. And by the time that you left office in December of '19, would you say that you came into compliance?

MS. RILEY: Objection.

But you can answer.

A. Not fully, but we tried.

Q. (By Mr. Carr) All right. Tell me -- flush that out for me some, and I understand this isn't something you can just do overnight. Because it's not a --

A. Right.

Q. -- it's not a problem that was created

overnight, you know. These are things that take a while to do and take a lot of money to do.

My question, I guess, is: When you were coming out of office, can you think of any things that were undone that you were trying to do to come into compliance with the civil rights findings?

A. Staffing was one of the problems.

Q. And describe that for me.

A. Staffing, people, jailers, detention officers. We tried to recruit the best we could, because, according to their standards, they wanted 400-plus, and there's no way you're going to get that, not for Hinds County. So we tried our best.

Q. So you tried to increase the number of certified corrections officers at the Hinds County Adult Detention Center, correct?

A. Correct.

Q. And is it fair to say you weren't given the budget to have 400 certified corrections officers at the Hinds County Adult Detention Center?

A. Yes.

Q. All right. Even if you had the budget, do you think you could have found 400 certified corrections officers for the Hinds County Adult Detention Center?

MS. RILEY: Objection.
But you can answer.
A. Well, when you have people that can't pass the background -- and detention isn't made for everybody, and then you have other agencies that pay more than you, it's fair to say that.
Q. (By Mr. Carr) Okay. Okay. In addition to chronic understaffing, what other problems that you were unable to, by your term as sheriff, come into compliance with that come to mind?
A. Well, we tried to repair the problem in the jail with the locks, because the door wouldn't lock. And that was --
Q. Right.
A. -- a problem, but that was really the first two problems.
Q. Okay. And did that have to do with the age of the facilities?
A. Yes.
Q. Okay. The investigation found that the jail failed to protect prisoners from serious harm under the Eighth Amendment.
I'm sorry about that loud noise, Sheriff. My office is right at the highway, and we've got a bunch of good ole boys with loud pipes that like to

run up and down the highway on a Friday, making a lot of noise. So I'm trouble -- I'm sorry if you have trouble hearing.

The investigation found that the Hinds County Adult Detention Center failed to protect prisoners from serious harm.

What steps can you annunciate that y'all took to remedy that?

A. We tried to hire more staff as best we could.

Q. Okay.

A. And we tried to get the locks repaired. In fact, they started repairing them before I left.

Q. All right. What efforts did you make to control contraband, or what changes did you make to control the influx of contraband in your jail after th- --

A. We --

Q. -- -is report came out?

A. Well, we stepped up our searches when -- in booking and even in the front of the entrance, where the employees would come in. That's how -- we arrested several of them, so we stepped up our efforts on that.

Q. Okay. Give me some details as to how you

did that. Like what would you do versus the policies of your predecessors to really crack down on contraband with the budget that you had?

A. Well, we could conduct shakedowns weekly, if not, every other week, and they were unannounced. Nobody knew, not even the warden, at some point.

Q. Uh-huh. Okay. Did you ever bring in any outside agencies to conduct shakedowns? Like I know here at Bolivar, sometimes they'll bring in the marshall or some other independent agency to conduct shakedowns.

Did your agency -- did your jail ever do that? And you --

A. Yes, we -- yes, I did.

Q. Okay. What other agencies would -- came in to conduct any shakedowns of your jail during your time as sheriff, sir?

A. The agencies that assisted us was the Mississippi Department of Corrections, the Mississippi Highway Patrol Special Operations group, Clinton Police Department, and I believe that's it.

Q. Why does bringing in an outside agency to conduct a shakedown help?

A. Well, you have the manpower.

Q. All right. Is it also because you don't

trust your own corrections officers to perform a shakedown?

A. No, I'm not going to say that, but I just like manpower.

Q. Okay. Okay. Next, the Department of Justice found that prisoners have suffered actual harm from the improper use of force. And just so I'm clear on the record, I'm referencing page 12 of the DOJ report.

Now, again, I know you may not be familiar with the actual letter or have read it recently. Can you tell me any steps -- or -- any steps that y'all took to remedy the allegation or the finding that prisoners have suffered actual harm from the improper use of force by your own staff --

A. Well, we --

Q. -- the 2015 staff? Sorry, it's not your staff.

A. Okay. Well, we had -- we stepped up efforts on training we -- like tasers, so you wouldn't have to physically use much force. And, like I said, we tried to step up efforts on recruiting more people.

Q. Okay. So you found that because of -- would it -- is it safe to say that if the jail was

understaffed, then the officers may use force versus if they had more people there, they wouldn't use force?

Is that what you're saying?

A. I think if you had more people there, it would help, because, number one, the guys were outnumbered either way. But I think if you had more people -- because the way the jail is designed, it would be a deterrent.

Q. Okay. Can you describe for me what you would do, as sheriff, to train your employees in use of force, when to put hands on somebody, when not to?

What kind of training would they get?

A. Well, the training they were getting -- because we were doing it anyway -- was physical training, takedown holds, come-along holds, things like that. And, as I said, we also added tasers to the, you know -- the officers that wanted to come in.

Q. Okay. And just so we're clear, Sheriff, in this particular allegation, it doesn't involve any use of tasers. I'm more interested in the training that was provided to your officers on use of force with their hands, you know, putting --

A. Uh- --

Q. -- yo- --

A. -- -huh.

Q. -- -ur hands on somebody.

So how would an officer be trained in that your administration? Where would they get that training from?

A. We would do it. We would do it in-house.

Q. Okay. Is that like through a state program, or is that just from Hinds County on-the-job training?

A. Both.

Q. Okay. Do all -- the corrections officers that were working in the adult detention facility under your administration, did they have to pass some type of like minimum standards state certification?

A. No. They just had to go through the training itself. They would have to do that.

Q. Where was that training offered?

A. Raymond Detention Center, in our classroom training.

Q. By whom was it offered?

A. Lieutenant Terry Miller.

Q. All right. And that -- and he's an

employee of the Hinds County Sheriff's Department, or was?

A. He was when I was there.

Q. All right. Is there any part of -- and I know I've asked you a version of this before, but maybe I'll ask it a different way. Is there any part of the Department of Justice investigations and findings that you, as the sheriff, found or believed to be, "Look, this is simply not true"?

MS. RILEY: Objection.

You can answer, if you remember everything in that report that you don't have.

A. You have asked me that, but, no, I don't remember it.

Q. (By Mr. Carr) Say that again --

A. I --

Q. -- Sheriff.

A. -- I don't remember it.

Q. Okay.

A. But I didn't disagree with anything in their findings.

Q. Okay. Okay. As the sheriff of Hinds County -- former sheriff of Hinds County, you are the chief policymaker for the sheriff's department,

correct?

A. Yes.

Q. I mean, I understand you go to the board of supervisors to ask for your budget. But, other than that, the board of supervisor doesn't make policy for your sheriff's department; you do, as the elected sheriff, right?

A. Correct.

Q. Okay. And you did that during your administers from January of 2016 until you left office in December of 2019, correct?

A. Correct.

MR. CARR: Let's go off the record just for a second.

MS. RILEY: Okay.

(Off the record.)

MR. CARR: Let's get back on then.

Sheriff, I appreciate your time, and I believe that's all the questions I have for you today, sir.

Thank you.

THE WITNESS: Okay. Thank --

MS. RILEY: Thank --

THE WITNESS: -- you.

MS. RILEY: -- you.

No questions.

(Deposition concluded at 2:07 p.m.)

CERTIFICATE OF DEPONENT

I, Victor Mason, deponent in this deposition, hereby certify that I have examined the foregoing 20 pages and find them to contain a full, true, and accurate transcription of the testimony as given by me on October 2, 2020, via Zoom.

Page Line Correction (If Any)

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

____ ____ ______________________________

This the ______ day of __________, 2020.

______________________________

VICTOR MASON

State of Mississippi

County of __________

Sworn to and subscribed before me, this the _____ day of

______________, 2020.

______________________________

NOTARY PUBLIC

MY COMMISSION EXPIRES ______________

CERTIFICATE OF COURT REPORTER

I, Courtney R. Taylor, Court Reporter and Notary Public in and for the County of Bolivar, State of Mississippi, do hereby certify that the foregoing 20 pages, and including this page, contain a true and accurate transcription of the testimony of Victor Mason, as taken by me in the aforementioned matter at the time and place heretofore stated by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in this matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, in the final outcome of this proceeding.

Witness my signature and seal this the 14th day of October, 2020.

COURTNEY R. TAYLOR, CCR #1668

My Commission Expires: August 19, 2023

-

-ection 9:15
-huh 17:3
-is 13:19
-ur 17:4

1

12 15:8
16 8:6
19 5:22 10:15

2

2015 15:17
2016 5:19 7:13 19:10
2017 6:3,18
2019 7:13 19:11
28 6:18
28th 6:3
2:07 20:2

4

400 11:19,23
400-plus 11:12

A

ability 7:2
actual 15:6,11,14
added 16:18
addition 12:7
administer 4:3
administers 19:10
administration 8:14 17:6,15
adult 8:13 9:1 11:16, 20,24 13:5 17:14
advice 8:1
Affairs 6:7,13,17
age 12:17
agencies 12:5 14:8,15, 18
agency 14:10,12,22
Agreed 4:5,6
allegation 6:18 15:13 16:22
alleged 6:22,23
alleges 6:24
Amendment 12:22
annunciate 13:7
arrested 13:23
assigned 6:7,8
assisted 14:18
attorney 4:14
avoided 5:24

B

back 19:17
background 12:4
believed 18:8
board 19:3,5
Bolivar 14:9
booking 13:21
boys 12:25
bring 14:7,9
bringing 14:22
budget 9:6 11:19,22 14:3 19:4
bunch 12:25

C

capacity 4:16 5:1
Carr 4:5,10,14 7:18 8:5 9:8,21 10:3,20 12:7 18:16 19:13,17
case 6:10
Center 8:13 9:2 11:16, 20,25 13:5 17:21
certification 17:17
certified 11:15,19,23
charge 7:5
chief 18:25
chronic 12:8
civil 8:10 10:11 11:6
claim 6:5
classroom 17:21
clear 15:8 16:21
Clinton 14:21
Coahoma 5:17
come-along 16:17
complaint 6:9
compliance 8:24 9:5, 11 10:11,16 11:6 12:10
concluded 20:2
conditions 9:1
conduct 14:4,8,10,16, 23
conducting 8:12
confirm 4:2
consistent 7:22
contraband 13:15,16 14:3
control 13:15,16
correct 5:23 6:19 8:1, 8,16,17 10:12,13 11:16,17 19:1,8,11,12
corrections 11:15,19, 24 14:19 15:1 17:13
counsel 4:2
County 4:15 5:18 8:13 9:1 11:13,15,20,24 13:5 17:10 18:1,24
court 4:1 5:11
crack 14:2
created 10:25

D

December 5:21,22 6:3,18 10:15 19:11
department 7:4 8:10, 25 10:11 14:19,21 15:5 18:1,7,25 19:6
deposition 4:19 5:8 20:2
depositions 4:22 5:3, 7
describe 11:8 16:10
designed 16:8
detailed 8:11
details 13:25
detention 8:13 9:2 11:9,16,20,25 12:4 13:5 17:14,21
determine 7:10
deterrent 16:9
disagree 18:21
division 8:10 10:12
documents 6:5
DOJ 10:7 15:9
door 12:12
draft 7:7,10
duly 4:8

E

earlier 8:9
efforts 10:10 13:14,24 15:20,22
Eighth 12:22
elected 19:7
employee 18:1
employees 13:22 16:11
end 5:10,20 7:13

**ended** 5:19
**entrance** 13:21
**especial** 7:7
**EXAMINATION** 4:10
**examined** 4:8
**expect** 5:1
**experience** 7:16

F

**facilities** 12:18
**facility** 17:14
**fact** 13:13
**failed** 12:21 13:5
**fair** 5:13,14 7:18 11:18 12:6
**familiar** 8:18,19 15:10
**filed** 4:15
**finding** 15:13
**findings** 9:10,20 10:12 11:6 18:8,22
**fit** 7:20
**flush** 10:20
**force** 6:22,23 7:10 15:7,15,21 16:1,3,12, 24
**format** 5:8
**formulated** 7:12
**found** 11:23 12:20 13:4 15:6,24 18:8
**Friday** 13:1
**front** 8:22 13:21
**fully** 10:19

G

**general** 7:7
**generally** 8:23 10:8
**Give** 13:25
**good** 5:15 12:25
**group** 14:20
**guess** 11:3
**guys** 16:6

H

**hands** 16:12,25 17:4
**happened** 6:2 10:6
**harm** 12:21 13:6 15:7, 14
**hearing** 13:3
**highway** 12:24 13:1 14:20
**Hinds** 4:15 5:18 8:13 9:1 11:13,15,20,24 13:4 17:10 18:1,23,24
**hire** 13:9
**holds** 16:17
**Hundreds** 4:24

I

**imagine** 4:21
**improper** 15:7,15
**improve** 9:1
**in-house** 17:8
**incident** 6:2,10,22
**increase** 11:14
**independent** 6:21 14:10
**individual** 4:17
**influx** 13:16
**interested** 16:23
**Internal** 6:6,12,17
**investigation** 8:12,19, 20 12:20 13:4
**investigations** 18:7
**investigator** 6:7
**involve** 16:22
**involving** 8:14
**issued** 8:11

J

**jail** 12:12,21 13:16 14:12,16 15:25 16:8
**jailers** 11:9
**January** 5:19,20 8:6 19:10
**Justice** 8:11,25 15:6 18:7

K

**kind** 16:14
**knew** 14:6

L

**lawsuit** 4:15
**left** 10:14 13:13 19:10
**legal** 7:25
**letter** 8:11,18,21 15:11
**Lieutenant** 17:24
**lock** 12:12
**locks** 12:12 13:12
**looked** 6:19
**lot** 11:2 13:2
**loud** 12:23,25

M

**made** 9:10 10:10 12:4
**make** 7:3 13:14,15 19:5
**making** 13:1
**manpower** 14:24 15:4
**marshall** 14:10
**Mason** 4:7,12,13 5:16
**Melvin** 4:14 6:22,24
**Mike** 4:14
**Miller** 17:24
**mind** 12:10
**minimum** 17:16
**Mississippi** 14:19,20
**money** 11:2
**months** 8:9

N

**Neal** 4:15 6:23,24
**Neal's** 6:18
**noise** 12:23 13:2
**number** 11:14 16:6

O

**oath** 4:4
**Obj-** 9:13
**object** 9:3,19
**objected** 9:10,24
**Objection** 7:14 8:2 10:1,17 12:1 18:10
**offered** 17:20,23
**office** 8:6 10:15 11:4 12:24 19:11
**officer** 17:5
**officers** 4:17 6:24 11:10,15,19,24 15:1 16:1,19,24 17:13
**ole** 12:25
**on-the-job** 17:11
**Operations** 14:20
**opportunity** 6:4
**orders** 7:7
**organization** 7:6
**outnumbered** 16:7
**overnight** 10:22 11:1

P

p.m. 20:2
pandemic 5:24
paper 6:5
part 18:4,7
pass 12:3 17:15
past 7:16
Patrol 14:20
pay 12:5
people 11:9 12:3 15:23 16:2,5,8
perform 15:1
period 8:14
physical 16:16
physically 15:21
pipes 12:25
point 14:6
Police 14:21
policies 7:7 14:2
policy 7:3,11,19 19:5
policymaker 18:25
power 7:3
predecessor 7:19 8:15
predecessors 14:2
present 4:2
prisoners 12:21 13:6 15:6,14
problem 10:25 12:11, 15
problems 11:7 12:8,16
program 17:10
protect 12:21 13:5
provided 16:24
put 16:12
putting 16:25

Q

question 5:10 7:14 8:2 11:3
questions 4:18 5:9 19:19 20:1

R

Raymond 17:21
read 6:9,12 15:11
recall 6:14
recently 15:11
recollection 6:21
record 4:11 15:8 19:13,16
recruit 11:10
recruiting 15:23
referencing 15:8
remedy 13:8 15:13
remember 18:11,15, 19
repair 12:11
repaired 13:12
repairing 13:13
report 6:13,17,19 10:7 13:19 15:9 18:12
reporter 4:1 5:11
reports 6:10
requested 9:22
requests 10:12
requirements 8:25
respond 5:11
review 6:4 7:19
reviewed 8:4
revise 7:20
rights 8:10 10:12 11:6
RILEY 4:6 7:14 8:2 9:3, 13,15,18 10:1,17 12:1 18:10 19:15,23,25
run 13:1

S

safe 15:25
searches 13:20
shakedown 14:23 15:2
shakedowns 14:4,8, 11,16
sheriff 4:17,21 5:17,24 7:2 8:24 9:9 12:9,23 14:17 16:11,21 18:8, 18,23,24 19:7,18
sheriff's 7:3 10:10 18:1,25 19:6
sheriffs 5:3
simply 18:9
sir 4:11,18 14:17 19:20
sit 9:9
situations 10:6
Special 14:20
specifics 8:21
staff 13:9 15:15,17,18
Staffing 11:7,9
standards 7:22 11:11 17:16
started 5:19 13:13
state 4:11 17:9,16
step 15:22
stepped 13:20,23 15:19
steps 13:7 15:12
stipulate 4:3
strike 10:9
suffered 15:6,14
supervisor 19:5
supervisors 19:4
sworn 4:8

T

takedown 16:17
talk 5:12
tasers 15:20 16:18,23
term 5:16 12:9
Terry 17:24
testified 4:9
th- 13:17
things 11:1,4 16:17
time 8:14 10:14 14:17 19:18
today 4:18 5:12 9:9 19:20
told 10:4
tools 7:9
train 16:11
trained 17:5
training 7:23 15:20 16:14,15,17,23 17:7, 11,19,20,22
trouble 13:2,3
true 18:9
trust 15:1
tweak 7:20
type 17:16

U

U.S. 8:10,25
Uh- 17:1
Uh-huh 14:7
unable 12:9
unannounced 14:5
understaffed 16:1
understaffing 12:8
understand 5:6 9:23 10:21 19:3

**undone** 11:5

V

**version** 18:5
**versus** 14:1 16:1
**Victor** 4:7,12
**videoconference** 4:4

W

**wait** 5:9
**wanted** 9:6 11:11 16:19
**warden** 14:6
**week** 14:5
**weekly** 14:4
**wondering** 10:6
**work** 5:7
**working** 7:17 17:14

Y

**y'all** 13:7 15:13
**year** 5:20,21
**yo-** 17:2

Z

**Zoom** 5:8